## IN THE UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TONYA M. BEASLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:19-1109 |
| ) | |
| GRANITE CITY, a municipal corporation, ) | **JURY TRIAL DEMANDED** |
| and CRAIG KNIGHT, ) | |
| ) | |
| Defendants. ) | |

### COMPLAINT

COMES NOW Plaintiff Tonya M. Beasley, by and through her attorney Brandy B. Barth of Newton Barth. L.L.P., and for her Complaint against Defendants Granite City, a municipal corporation, and Craig Knight, and in support thereof, states as follows:

### Nature of the Action

1. This action is brought under 42 U.S.C. § 1983 for the violation of Plaintiff's First Amendment Right to Freedom of Association and also to remedy retaliatory discipline and harassment against a whistleblower employed with Granite City, a municipal corporation, under the Illinois Whistleblower Act, 740 ILCS 174/ ("IWA"), as well as Illinois tort law claims against Defendants Granite City and Plaintiff's supervisor, Captain Craig Knight. The Defendants created and carried out a conspiracy to retaliate against Plaintiff for exercising her First Amendment rights and/or for whistleblowing.

### Parties

2. Plaintiff Tonya M. Beasley ("Beasley") is a resident of Madison County, Illinois.

3. Defendant Granite City is a municipal corporation with its principal office located

in Madison County, Illinois, and at all times relevant to the allegations herein, was the location where the illegal activities described below took place.

4. Defendant Craig Knight ("Knight" or "Captain Knight") is an employee and agent of the Granite City Police Department, employed at the rank of Captain, and a resident of Madison County, IL.

5. At all times relevant to the allegations herein, Plaintiff was an employee of Defendant Granite City.

## Jurisdiction and Venue

6. This action is brought pursuant to 42 U.S.C. § 1983, as well as the First, Fifth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over Plaintiff's state law claims pursuant to its supplemental jurisdiction power in 28 U.S.C § 1367.

7. Plaintiff requests a jury trial pursuant to Federal Rule of Civil Procedure 38(b).

8. Venue is proper in the Southern District of Illinois because all Defendants reside there and all of the vents complained of herein occurred in Madison County, Illinois, within the Southern District of Illinois.

## Facts Common to All Counts

9. Plaintiff began her employment for Defendant Granite City in 1994 in their summer youth program.

10. Plaintiff began working for the Granite City Police Department ("GCPD") on or around 1998, when she was hired as a Dispatcher, a position she still works in today.

11. Plaintiff joined White Collar Chapter of Local #3405, Council 31 of the American

Federal Of State, County & Municipal Employees AFL-CIO ("Local 3405") in 1996.

12.     On March 13, 2017, Plaintiff's direct supervisor, Jonathan Blaylock ("Blaylock"), filed as Case No. 2017-AR-105 a complaint in the Circuit Court of Madison County, Illinois, alleging that he was being unfairly disciplined in violation of the Illinois Whistleblower Act for reporting to the Federal Bureau of Investigation ("FBI") that Granite City Police Chief Rich Miller's ("Chief Miller") family was involved in illegal production and sale of cannabis oil, including the trafficking of large quantities of cannabis across state lines, and that one of the customers was the wife of Defendant Knight.

13.     On or around May 3, 2017, while both were at work, and after a series of other instances of retaliatory discipline, Defendant Knight screamed and yelled at Blaylock for a number of alleged disciplinary reasons.  Blaylock visited his doctor soon after, and upon doctor's orders, was told to take sick leave from work due to dangerously high blood pressure and stress levels.

14.     While Blaylock was on sick leave, Chief Miller began making comments in front of other GCPD employees indicating his retaliatory anti-whistleblower motive in disciplining Blaylock.

15.     Upon information and belief, shortly after April 18, 2017, Chief Miller began telling subordinates that they can forget about promotions because he is "not going anywhere" as a result of Lieutenant Blaylock's whistleblowing and his subsequent filing of his suit.

16.     Upon information and belief, shortly after April 18, 2017, Chief Miller told an additional subordinate, "Thanks to your boy Blaylock shoving his dick in my ass and fucking me dry, I'm not going anywhere."

17. Upon information and belief, on or around May 4, 2017, Chief Miller told one of Blaylock's subordinates, Officer John Redstone ("Redstone"), that a performance improvement plan ("PIP") Redstone was put on was "not about him," implying that it was a way to retaliate against Lieutenant Blaylock via association.

18. Blaylock amended his complaint on May 11, 2017, to include these comments from Miller, and to allege additional facts.

19. After learning that GCPD employees were informing Blaylock of his comments pertaining to his anti-whistleblower retaliatory motive against Blaylock, Chief Miller stated to a group of employees that their loyalty is to him, that they are being disloyal by conveying information to Blaylock; and that he couldn't believe that Redstone would tell Blaylock that Redstone's discipline was about Blaylock and not him.

20. Chief Miller also chillingly noted that if no one steps forward to admit to it now, that he'll find out who has been supplying Blaylock with information when he gets the replies to the Interrogatories in Blaylock's lawsuit, and that at that point, he will address the disloyalty.

21. There were three GCPD employees in the room when Chief Miller made the statement alleged in Paragraph 23: Plaintiff Tonya Beasley, Lieutenant Jenna DeYong, and Dispatcher Brad Larose.

22. Around the same time that Chief Miller was threatening employees regarding the Blaylock lawsuit, Plaintiff was beginning to assist the union in contract negotiations for the dispatchers.

23. From May 2013 to February 2017, Plaintiff acted as President of Local 3405.

24. Starting as early as 2002, Plaintiff became involved in contract negotiations on

behalf of the dispatchers for Local 3405.

25. Plaintiff helped negotiate the contract dated May 1, 2013 to April 30, 2017 ("2013 – 2017 Contract").

26. Beth Garrison, also a dispatcher for Granite City, became Union President in 2017. Plaintiff, having served as president for the previous four years, remained the point person for the contract negotiations.

27. During the 2013-2017 Contract, officers in charge at the Granite City Police Department began requesting and/or requiring dispatchers to perform police officer duties, including but not limited to:

    a. Sex offender registration;

    b. Checking prisoners every thirty (30) minutes;

    c. Releasing prisoners;

    d. Cooking meals/serving meals/making kool-aid for prisoners 3 times a day;

    e. Providing medicine to prisoners when necessary;

    f. End of day shift report;

    g. Walk-in complaints/assistance;

    h. Updating jail lists when officers book prisoners;

    i. Maintaining jail cards;

    j. Scanning court paperwork, producing a list of prisoners for court, and emailing lists to court each morning;

    k. Collecting court paperwork and bond money for court to be taken over each morning; and

      l.    Fielding and responding to legal questions and issues from the community;

28. Contract negotiations for a new contract began in early 2017.

29. On or about May 23, 2017, Plaintiff had a heated disagreement with Chief of Police Miller regarding extra Street Department Duties that the City and Police Department now expected dispatchers to perform, in addition to the police department duties the Chief already expected dispatchers to perform.

30. On June 19, 2017, Plaintiff, on behalf of dispatchers in Local 3405, presented proposals to City representatives requesting additional pay and training for dispatchers being required to perform police officer duties.

31. The Mayor expressed surprise that dispatchers were performing officer in charge duties and requested a list of additional duties that dispatchers were performing instead of police officers.

32. At the time the list was requested, Plaintiff specifically stated to the City representatives that providing such a list would cause issues with police supervisors and subject them to potential retaliation.

33. In response, the Mayor stated that "if there is any retaliation, Rich Miller (the Chief of Police) has a boss, too, you call me."

34. After the meeting in June of 2017, police department supervisors began retaliating against Plaintiff in numerous ways, including but not limited to:

      a.    Captain Knight denied Plaintiff's "comp time" request after not having a lunch break, something that was normal;

      b.    When Plaintiff informed him that such denial was a violation of the union

contract; Knight demanded that Plaintiff fill out a new form, and said that Plaintiff now had to add more details to explain the reason for her "comp time" request, which was a change in normal procedure and was directed only at Plaintiff.

35. The list of additional duties dispatchers had been performing instead of police officers was provided to City representatives at the next contract negotiation meeting on July 12, 2017. See "List", attached hereto as Exhibit 1

36. Only five hours later, Defendant Knight circulated an email to dispatchers and officers in charge, identifying duties from the list that was provided by Plaintiff, and identifying what duties dispatchers would no longer be required of dispatchers.

37. On August 3, 2017, Plaintiff met with the Mayor for further contract negotiations, and informed the Mayor that dispatchers were still having contact with prisoners, still are required to move witnesses, subjects and prisoners, and still prepare jail cards.

38. This same day, Defendant Knight sent a text message to Plaintiff that stated "see me after the negotiation meeting."

39. Fearing that this meeting was requested due to Plaintiff's reporting of the additional duties that the dispatchers were being required to do, Plaintiff and Garrison requested that Ed LaPorte, the union representative, be present when Plaintiff and Garrison meet with Defendant Knight.

40. The next day, Captain Knight sent an email on August 4, 2017, stating that all "comp time" requests must be sent directly to his office for approval, which had never been done before.

41. August 8, 2017, Plaintiff was denied "comp time."

42. August 11, Plaintiff was again denied "comp time." Plaintiff advised Captain Knight that this denial was a violation of the union contract and that she would be filing a grievance.

43. August 11, 2017, Plaintiff had an incident with a prisoner where she thought a prisoner had spit on her.

44. On August 18, 2017, Lieutenant Blaylock filed his Second Amended Complaint in his case, alleging Chief Miller's statements regarding the Chief using the Interrogatories to find out who was giving Blaylock information, and to retaliate against them.

45. Just four days later, on or around Friday, August 22, 2017, Plaintiff Tonya M. Beasley was called in to the office and sent home early for an issue involving a prisoner that Plaintiff had believed had spit on her.

46. Plaintiff first filled out a form regarding the incident, but declined to turn it in, because she wasn't sure at that point if it was spit or some other liquid from the prisoner's meal that he flung at her; either way, the liquid had only hit her pants and not her skin, so Plaintiff declined to turn in the form and decided not to make a big deal out of it.

47. Defendant Knight alleged that somehow this was a serious violation of GCPD policy.

48. The next Monday, August 25, 2017, Plaintiff reported to work for her regularly-scheduled shift, and was to have a meeting with Chief Miller at 10:00 a.m.

49. When Plaintiff got to the door of the GCPD, she was told by another employee that she wasn't allowed in, and that she should come back at 10:00 a.m. for her meeting with the

Chief.

50. That day, August 25, 2017, Chief Miller put Plaintiff on paid suspension while GCPD "investigated" her conduct in the workplace.

51. On August 29, 2017, Plaintiff was informed by another GCPD employee that Chief Miller said she was fired, and that the termination papers were written up and ready for Plaintiff to sign.

52. Plaintiff nearly had a nervous breakdown after finding out that she would be losing her job of nearly twenty (20) years over something so minor.

53. Soon after, a GCPD employee told Plaintiff that Chief Miller had found out Plaintiff had been speaking with Lieutenant Blaylock's attorney.

54. Plaintiff was later told that she was not really fired, and just on paid suspension until she drafted a letter about the prisoner spitting incident, and if she just wrote the letter, she would be brought back to work.

55. Plaintiff drafted the letter, but Chief Miller refused to lift her suspension.

56. Plaintiff also works part-time as an independent contractor with Madison County, doing 9-11 training.

57. On or around Tuesday, September 12, 2017, Defendant Knight spoke with Plaintiff's supervisor at Madison County, Dana Burris, and told her that Plaintiff had been fired from the GCPD, and that as a result of that, Plaintiff would be losing her certifications and would be unqualified to work for Madison County.

58. Defendant Granite City had prior notice of both Miller and Knight's propensity to retaliate against and terrorize whistleblowers within the department.

59. Defendant Granite City continued to retain Chief Miller after it knew specifically of the risk he posed to whistleblowers at GCPD.

60. Defendant Granite City continued to retain Captain Knight after it knew specifically of the risk he posed to whistleblowers as a result of Blaylock's lawsuit and the retaliation he was subjected Plaintiff to because of the exercise of her First Amendment rights in the union.

61. Chief Miller's and Captain Knight's retaliation against and harassment of Plaintiff constitutes a wicked and intentional retaliatory scheme shrouded in subterfuge and pretext, aimed at punishing Dispatcher Beasley in retaliation for exercising her First Amendment rights, for whistleblowing and participating as a witness in a whistleblower lawsuit, and chilling any further whistleblowing activity within the GCPD or contract negotiations on behalf of the dispatchers.

62. This continued harassment has caused Plaintiff physical manifestations of emotional distress, pain and suffering, loss of enjoyment of life, and sleeplessness.

63. Defendants Granite City and Knight's acts were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's rights under the United States Constitution and the IWA and under Illinois common law.

### COUNT I:  42 U.S.C. § 1983
### VIOLATION OF PLAINTIFF's FIRST AMENDMENT RIGHT TO FREEDOM OF ASSOCIATION

64. Plaintiff realleges the preceding paragraphs on this Complaint into Count I of the Complaint as if fully set forth herein.

65. Plaintiff was suspended and subjected to a hostile working environment based

upon the exercise of her First Amendment rights because of her union affiliation.

66. Plaintiff's union affiliation and her work for that union was a motivating factor and/or played a part in the decision to suspend Plaintiff and subject to her to a hostile working environment based upon her work with the union.

67. Plaintiff's suspension was an adverse employment action authorized, approved and/or ratified by the City and Knight, acting under color of state law as part of their broader conspiracy to retaliate against Plaintiff based upon her work and contract negotiations for the union.

68. Plaintiff's suspension and the subsequent retaliation was subjected to violate her rights secured by the Constitution of the United States, specifically the First, Fifth and Fourteenth Amendments.

69. As a direct and proximate result of Plaintiff's suspension and continued retaliation by Defendants for exercising her First Amendment right to freedom of association, taken under color of law, has sustained damages.

70. As a direct and proximate result of Plaintiff's suspension and continued retaliation by Defendants, Plaintiff suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation.

71. The conduct of the City and Knight as set forth herein was wanton, willful and showed a reckless indifference to Plaintiff's constitutional rights as set forth above, justifying an award of punitive damages against the City and against Knight in his individual capacity.

WHEREFORE, Plaintiff Beasley prays this Court to enter judgment in her favor and

against Defendants and thereafter:

(a) Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and other benefits of employment;

(b) Award damages to Plaintiff for her emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation;

(c) Award Plaintiff punitive damages against the Defendants in such sum as this court believes will serve to punish them and deter them and others from like conduct;

(d) Award Plaintiff the costs of this action, together with her reasonable attorney's fees; and

(e) Grant such other and further relief as may appear to the Court to be equitable and just under the circumstances.

### COUNT II: RETALIATION AGAINST PLAINTIFF IN VIOLATION OF THE IWA
### (AGAINST DEFENDANT GRANITE CITY)

72. Plaintiff realleges Paragraphs 1 to 45 of this complaint as if fully set forth herein.

73. The IWA makes it illegal for an employer such as Defendant Granite City to retaliate against an employee such as Plaintiff for disclosing or attempting to disclose public corruption or wrongdoing.  *See* 740 ILCS § 174/20.1.

74. Chief Miller's threat to retaliate against witnesses in Blaylock's suit is itself illegal retaliation under the IWA.  *See* 740 ILCS § 174/20.2.

75. Granite City's suspension and alleged termination of Plaintiff was materially

adverse to a reasonable employee, and therefore illegal and in violation of the IWA.

76. As a direct and proximate result of Granite City's illegal retaliatory discipline as described above, Plaintiff has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and is expected to incur future damages.

77. The above-described conduct by Granite City was willful and wanton, and with reckless disregard and indifference to the IWA, and to Plaintiff's rights thereunder.

WHEREFORE, Plaintiff Beasley prays this Court to enter judgment in her favor and against Defendants and thereafter:

(a) Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and other benefits of employment;

(b) Award damages to Plaintiff for her emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation;

(c) Award Plaintiff punitive damages against the Defendants in such sum as this court believes will serve to punish them and deter them and others from like conduct;

(d) Award Plaintiff the costs of this action, together with her reasonable attorney's fees; and

(e) Grant such other and further relief as may appear to the Court to be equitable and just under the circumstances.

**COUNT III: NEGLIGENT RETENTION (against Defendant Granite City)**

78. Plaintiff repeats and realleges paragraphs of this complaint as if fully set forth herein.

79. Defendant Granite City knew, or should have known, that Chief Miller and Defendant Craig Kight had a particular unfitness for their positions so as to create a danger of harm to those in their charge, specific to retaliation.

80. This unfitness was known or should have been known in the weeks and months prior to the events complained of, such that retaining Miller and Knight as employees was unreasonable.

81. This particular unfitness proximately caused Plaintiff's injuries.

WHEREFORE, Plaintiff Beasley prays this Court to enter judgment in her favor and against Defendants and thereafter:

(a) Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and other benefits of employment;

(b) Award damages to Plaintiff for her emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation;

(c) Award Plaintiff punitive damages against the Defendants in such sum as this court believes will serve to punish them and deter them and others from like conduct;

(d) Award Plaintiff the costs of this action, together with her reasonable attorney's fees; and

(e) Grant such other and further relief as may appear to the Court to be equitable and just under the circumstances.

Respectfully submitted,

**NEWTON BARTH, L.L.P.**

By: /s/ *Brandy B. Barth*
Brandy B. Barth, Ill. Bar No. 6285366
555 Washington Ave., Suite 420
St. Louis, Missouri 63101
(314) 272-4490 – Telephone
bbarth@newtonbarth.com
Attorneys for Plaintiff