IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TONYA M. BEASLEY,
Plaintiff,

v.

Case No. 19–CV–01109–JPG

CITY OF GRANITE CITY and
CRAIG KNIGHT,
Defendants.

## **MEMORANDUM & ORDER**

**I.     INTRODUCTION**

This civil-rights case arises under the First Amendment to the United States Constitution, the Illinois Whistleblowers Act, and Illinois common law. Before the Court is Defendants City of Granite City and Craig Knight's Motion to Dismiss. (ECF No. 20). Plaintiff Tonya M. Beasley responded, (ECF No. 21), and Defendants replied, (ECF No. 24). For the reasons that follow, the Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. Counts II and III of the Complaint are **DISMISSED WITHOUT PREJUDICE**; and Plaintiff is **GRANTED LEAVE** to amend the Complaint until Thursday, April 2, 2020.

**II.    PROCEDURAL & FACTUAL HISTORY**

Plaintiff began working as a dispatcher for the Granite City Police Department in 1998. (Compl. 2, ECF No. 1). In 2017, Plaintiff's supervisor, Lieutenant Jonathan Blaylock, informed the FBI that Police Chief Rich Miller's family was producing illicit cannabis products and selling them to Captain Craig Knight's wife, among others. (Id. at 3). Lieutenant Blaylock later filed suit in Illinois state court against the City and Captain Knight alleging that he was retaliated against for this disclosure in violation of the Illinois Whistleblower Act. (Id.). The court entered judgment on the pleadings against Lieutenant Blaylock, (Defs.' Mem. Supp. Mot. Dismiss Ex. 1), and he

moved for voluntarily dismissal, Blaylock v. Granite City, No. 2017AR000105 (Ill. App. Ct. filed June 13, 2018).

Lieutenant Blaylock took sick leave while the state-court suit was still ongoing. (Compl. 3). During his absence, Chief Miller and Captain Knight made disparaging remarks about Lieutenant Blaylock to his subordinates, including Plaintiff. (Id. at 3–4). One was then placed on a performance improvement plan and told that it was "not because of him." (Id. at 4). A subordinate informed Lieutenant Blaylock about what was happening while he was away, and he used that information to amend his complaint. (Id. at 4). Although Chief Miller did not know who provided Lieutenant Blaylock with information, he threatened to retaliate against Plaintiff and two others if he found out that they did. (Id.).

Around the same time, Plaintiff was the principal negotiator for Local 3405, a dispatchers' union. (Id. at 4–5). In the preceding years, dispatchers were increasingly required to perform tasks ordinarily assigned to police officers. (Id. at 5). When negotiations for the 2017 contract began, Chief Miller sought to expand the list of duties delegated to dispatchers. (Id. at 6). After reaching an impasse with Chief Miller, "Plaintiff, on behalf of dispatchers in Local 3405, presented proposals to City representatives requesting additional pay and training for dispatchers being required to perform police officer duties." (Id.). The Mayor was surprised to learn about this delegation of duties, and he requested that Plaintiff provide him with a list of tasks that were being delegated to dispatchers. (Id.).

After meeting with the Mayor, Plaintiff was summarily denied comp time by Captain Knight. (Id. at 7). And after a second meeting, Captain Knight began requiring all comp time requests to be sent directly to his office for approval. (Id. at 7). The following week, Plaintiff filed two comp time requests, both of which were denied. (Id. at 8).

Later that month, Plaintiff had an incident with a prisoner that may have spit on her. (Id.). Plaintiff considered it minor and did not file an incident report. (Id.). Chief Miller, however, deemed Plaintiff's failure to file an incident report a serious violation of department policy and placed Plaintiff on paid suspension. (Id. at 9). Another employee also informed Plaintiff that Chief Miller found out that she provided information to Lieutenant Blaylock's attorney. (Id.). Captain Knight then spoke with Plaintiff's supervisor at Madison County—where Plaintiff worked part-time training 911 dispatchers—and informed her that Plaintiff was terminated, would lose her dispatcher certifications, and would no longer be qualified to conduct dispatcher training. (Id.).

Plaintiff filed suit in this Court in 2019. Count I of the Complaint alleges that Defendants retaliated against her based on her union affiliation in violation of the First Amendment. (Id. at 10–12). Count II alleges that the City retaliated against her for assisting Lieutenant Blaylock in his state-court suit in violation of the Illinois Whistleblowers Act. (Id. at 12–13). And Count III alleges that the City negligently retained Chief Miller and Captain Knight in violation of Illinois common law. (Id. at 13–14).

## III. LAW & ANALYSIS

Plaintiff's Complaint states a claim under the First Amendment. However, it fails to state a claim under the Illinois Whistleblowers Act because Plaintiff does not allege that she made a qualifying disclosure under § 174/15; or that the "attempted" disclosure related to "public corruption or wrongdoing" under § 174/20.1. Finally, the Complaint fails to state a claim for negligent retention because Lieutenant Blaylock's suit alone was insufficient to place the City on notice that Chief Miller and Captain Knight had a propensity to retaliate.[1]

### A. Standard of Review

---

[1] Additionally, Defendants seek dismissal of a civil conspiracy claim, but Plaintiff did not plead that cause of action. Plaintiff also concedes that the City is immune from punitive damages.

Federal Rule of Civil Procedure 12(b)(6) authorizes defendants to seek dismissal of a complaint for failure to state a claim. To survive a motion to dismiss, the factual allegations in the complaint must plausibly suggest "a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). All well-pleaded allegations must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. Twombly, 550 U.S. at 555.

Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. Cont'l Cas. Co. v. Am. Nat. Ins. Co., 417 F.3d 727, 731 n.3 (7th Cir. 2005). The Court may take judicial notice of prior matters of public record—including state court decisions—without converting a motion to dismiss into a motion for summary judgment. 520 S. Mich. Ave. Assocs., Ltd. v. Shannon, 549 F.3d 1119, 1138 n.4 (7th Cir. 2008).

### B. Count I: Retaliation Under the First Amendment

Plaintiff alleges that Defendants violated her First Amendment associational rights by retaliating against her because of her union activity. Specifically, Plaintiff contends that Defendants repeatedly denied her comp time requests after she met with the Mayor to negotiate on behalf of Local 3405. Additionally, Plaintiff asserts that her suspension for failure to submit an incident report was pretextual, and the actual motivation was to stifle her work as a union representative.

The First Amendment to the United States Constitution secures America's tradition of free expression and association. "Free speech serves many ends. It is essential to our democratic form

of government, and it furthers the search for truth. Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends." Janus v. Am. Fed'n of State, Cty. & Mun. Emps., 138 S. Ct. 2448, 2464 (2018) (internal citations omitted). The right to associate "is cut from the same cloth." McDonald v. Smith, 472 U.S. 479, 482 (1985); see Griffin v. Thomas, 929 F.2d 1210, 1214 (7th Cir. 1991) (holding that freedom of association claims are assessed under the same analysis as freedom of speech claims).

In the employment context, the First Amendment prohibits public-sector employers from disciplining employees for speaking on issues of public importance. Pickering v. Bd. of Educ., 393 U.S. 563, 575 (1968); Connick v. Myers, 461 U.S. 138, 147 (1983). Where an employee alleges that she was retaliated against in violation of the First Amendment, she must prove that (1) her speech was constitutionally protected; (2) she suffered a deprivation likely to deter speech; and (3) her speech was at least a motivating factor in the employer's action. Swetlik v. Crawford, 738 F.3d 818, 825 (7th Cir. 2013).

An employee's speech is constitutionally protected where the employee spoke as a citizen on a matter of public concern, as opposed to an employee voicing a personal grievance of interest only to the employee. See Connick, 461 U.S. at 147. Whether an employee speaks as a citizen or an employee depends on whether the speech was made "pursuant to her official duties." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). This requires the Court to examine "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147–48. However, "[t]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern." Button v. Kibby-Brown, 146 F.3d 526, 529 (7th Cir. 1998).

Plaintiff states a claim for relief under the First Amendment. First, Plaintiff's speech was constitutionally protected because her union work was not done pursuant to her official duties as a dispatcher. Nor did it represent a solely personal grievance—Plaintiff represented her entire union cohort during the contract negotiations, including when she made demands to Chief Miller and the Mayor for better wages and training. Moreover, denied comp time, paid suspension, and threatening phone calls to other employers are significant deterrents to the exercise of First Amendment rights. Finally, considering the temporal proximity of the alleged retaliation to the contract negotiations, the disciplinary measures taken, and the justification proffered, it is plausible that Plaintiff's union activity was at least a motivating factor for the City's actions.

Plaintiff's claim for relief extends to both Defendants. Municipal liability may exist where the alleged "constitutional injury was caused by a person with final policymaking authority." McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995); see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Here, Plaintiff adequately alleged that Captain Knight had final policymaking authority: He was authorized to assign police officer tasks to dispatchers and readily did so; and he was directly responsible for the denial of Plaintiff's requests for comp time. Plaintiff also adequately pleaded that this retaliation was ratified by Chief Miller, who had final policymaking authority. This was suggested by the Mayor when he stated that Chief Miller would be held accountable in the event of retaliation. And Chief Miller was ultimately responsible for placing Plaintiff on paid suspension for pretextual reasons. Accordingly, the Complaint alleged enough facts to plausible suggest that Captain Knight personally retaliated against Plaintiff due her union activity; and that retaliation was executed by someone with final policymaking authority—either Captain Knight or Chief Miller—to render the City liable.

### C. Count II: Whistleblower Retaliation Under the Illinois Whistleblowers Act

Plaintiff also alleges that the City violated the Illinois Whistleblowers Act (IWA). Like Plaintiff, Lieutenant Blaylock also sued the City for retaliation. While the suit was still ongoing, Captain Knight and Chief Miller threatened Lieutenant Blaylock's subordinates—including Plaintiff—that any assistance in the suit would result in discipline. Chief Miller later learned that Plaintiff informed Lieutenant Blaylock about these threats. And Lieutenant Blaylock used that information to amend his state-court complaint. Plaintiff alleges that the assistance she provided to Lieutenant Blaylock constituted whistleblowing; and the threats, denial of comp time, and suspension constituted retaliation under the IWA. 740 ILL. COMP. STAT. §§ 174/1–174/40 (West 2012).

"Few courts have interpreted the IWA . . . ." Bello v. Village of Skokie, 151 F. Supp. 3d 849, 865 (N.D. Ill. 2015). The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature, Lutkauskas v. Ricker, 28 N.E.3d 727, 736 (Ill. 2015), and the statutory language "is the surest and most reliable indicator of legislative intent," People v. Marshall, 950 N.E.2d 668, 673 (Ill. 2011). When clear and unambiguous, the statutory language should be given its plain and ordinary meaning. J.S.A. v. M.H., 863 N.E.2d 236, 245 (Ill. 2007). The Court must refrain from reading into that language "exceptions, limitations, or conditions the legislature did not express." Madigan v. Kinzer, 902 N.E.2d 667, 671 (Ill. 2009). Where the statute does not supply a definition, the words must be construed consistently and in their proper context. People v. Trainor, 747 N.E.2d 339, 347 (Ill. 2001). In determining the plain meaning of a statutory term, it is appropriate for the Court to look to a legal dictionary for a definition. See Thomas v. Ill. Dept. of Healthcare & Family Servs., 48 N.E.3d 721 (Ill. App. Ct. 2016).

Section 174/15 is the IWA's principal provision, prohibiting retaliation against employees that "disclose information **in a court** . . . **or in any other proceeding**, where the employee has

reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILL. COMP. STAT. § 174/15(a) (emphasis added). Additionally, retaliation is prohibited against employees that disclose suspected violations "to a **government or law enforcement agency**." Id. § 174/15(b) (emphasis added). "[T]he employee must do more than merely voice his suspicion of unlawful conduct—he must *actually* report the suspected violation of state or federal law *to authorities*." Bello, 151 F. Supp. 3d at 865 (emphasis added).

Plaintiff fails to state a claim under § 174/15 because she did not disclose the suspected violations to a court, in any other proceeding, or to a government or law enforcement agency. Instead, Plaintiff disclosed the alleged threats of retaliation to Lieutenant Blaylock, who had no authority to take corrective action. Despite Plaintiff's argument that the information she provided was eventually transmitted to the state court, third-party "disclosure" is not the type of behavior that the IWA seeks to protect. See Huang v. Fluidmesh Networks, LLC, No. 16–CV–9566, 2017 WL 2023672, at *3 (N.D. Ill. July 18, 2017) ("The Court is not persuaded by Plaintiff's argument that he made an IWA-qualifying disclosure *through* [his supervisor].") (emphasis in original); cf. ALA. CODE § 36-26A-3 (1994) (protecting employees that report suspected violations "under oath or in the form of an affidavit"); FLA. STAT. ANN. § 112.3187(7) (West 2002) (protecting employees that report suspected violations "in a written and signed complaint" or "who are requested to participate in an investigation, hearing, or other inquiry"). A plain reading of § 174/15 suggests its protections only extend to *actual* disclosures in a court proceeding, whether that be by live testimony or sworn affidavit.

The IWA also protects against other retaliatory acts or omissions short of discharge "if the act or omission would be materially adverse to a reasonable employee and is because of the employee disclosing or **attempting to disclose public corruption or wrongdoing**." 740 ILL.

COMP. STAT. § 174/20.1 (emphasis added). Section 174/20.1 is not a catchall provision: Entitled "Other Retaliation," § 174/20.1 was added to "expand[] the scope of conduct that could rise to a cause of action" by including retaliation that falls short of termination. Money Mgmt., Inc. v. Thomas, No. 13–LM–392, 2017 WL 1135890, at *3 (Ill. App. Ct. Mar. 24, 2017). Unlike § 174/15, however, § 174/20.1 is limited to (attempted) disclosures relating to "public corruption or wrongdoing." E.g., Zimmerman v. Dameron, No. 2015–CV–1027, 2015 WL 4585622, at *1 (C.D. Ill. July 29, 2015) (alleging that police chief violated § 174/20.1 by taking evidence from criminal investigation for personal use and stealing ordinance violation payment).

The IWA does not define "public corruption" or "wrongdoing." Also termed "official misconduct," "public corruption" is generally defined as, "A public officer's corrupt violation of assigned duties by malfeasance, misfeasance, or nonfeasance." Official Misconduct, BLACK'S LAW DICTIONARY (11th ed. 2019). And "corruption" is generally defined as, "The act of doing something with an intent to give some advantage inconsistent with official duty and the rights of others." Corruption, BLACK'S LAW DICTIONARY (11th ed. 2019).

Plaintiff implies that "public corruption or wrongdoing" is a catchall phrase that encompasses any suspected violation of state, federal, or local law. Where § 174/15 protects *actual* disclosures regarding suspected violations of state, federal, or local law, § 174/20.1 protects *attempted* disclosures regarded suspected public corruption or wrongdoing.

If the Court were to adopt Plaintiff's interpretation, § 174/20.1 would render § 174/15 irrelevant. Under Plaintiff's reading of "public corruption or wrongdoing," § 170/20.1 would expand § 174/15's protection to attempted disclosures for the same violations. But the Court must "presume that several statutes relating to the same subject . . . are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and

— 9 —

harmonious." Uldyrch v. VHS of Ill., Inc., 942 N.E.2d 1274, 1279 (Ill. 2011). Accordingly, "political corruption or wrongdoing" cannot have such a broad meaning as to encompass *any* suspected violation of state or federal law. Rather, the Illinois legislature likely intended § 174/20.1 to provide specific protections for (attempted) disclosures of public corruption (or something akin to it, such as waste or mismanagement). See Spratt v. Bellwood Pub. Library, 380 F. Supp. 3d 783, 788 (N.D. Ill. 2019) (reading "or wrongdoing" out of § 174/20.1) ("Under the IWA, an employer may not retaliate against an employee . . . because the employee disclosed public corruption."); cf. OHIO REV. CODE ANN. § 4113.52 (West 1999) (protecting disclosures regarding "improper solicitation for a contribution"); WIS. STAT. ANN. § 230.80 (protecting disclosures regarding mismanagement, abuse of authority, and substantial waste of public funds).

Finally, Count II fails to state a claim under § 174/20.1 because Plaintiff's relay of information to Lieutenant Blaylock did not constitute an attempted disclosure in a court proceeding. The IWA does not state what constitutes an attempted disclosure. Here, Plaintiff contends that she attempted to disclose wrongdoing through Lieutenant Blaylock. As discussed, however, this is too attenuated to constitute an attempted disclosure in a court proceeding; Plaintiff made no apparent effort to enter an appearance, testify, or submit an affidavit to the state court.

### D.  Count III: Negligent Retention Under Illinois Common Law

"Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." Van Horne v. Muller, 705 N.E.2d 898, 904 (Ill. 1998). To state a claim for negligent retention, a plaintiff must allege "(1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have

been known at the time of the employee's . . . retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." Id. "The type of prior conduct by an employee which will be sufficient to put an employer on notice that the employee is unfit for a particular position will differ in every case." Id. at 906.

In Van Horne, the Illinois Supreme Court considered an allegation of negligent retention against a radio station. Id. at 901. The plaintiff argued that a radio personality employed by the station defamed him on air. Id. The plaintiff further argued that the personality had a history of outrageous and irresponsible conduct; and that the station was placed on notice that the personality would defame people on air. Id. at 906. The court disagreed, finding that since the personality's prior conduct, though reprehensible, was nondefamatory, the station should not have known that he was " 'likely' to engage in defamatory speech." Id. at 907.

The reasoning in Van Horne remains true here. Plaintiff alleges that the City negligently retained Chief Miller and Captain Knight because Lieutenant Blaylock's retaliation suit placed the City on notice of their propensity to retaliate against outspoken employees. However, the Illinois court entered judgment in favor of the City and Captain Knight after determining that they did not violate the Illinois Whistleblowers Act. Specifically, the court found that even if Captain Knight engaged in retaliation, his behavior was "little more than mere inconvenience and [did] not rise to a level of being severe or pervasive conditions of employment." Lieutenant Blaylock then dismissed the case. Like the personality in Van Horne, Captain Knight's behavior may have been unprofessional or even outrageous, but it did not rise to the level of illegality. Based on these facts, the City was not on notice that Chief Miller and Captain Knight were particularly unfit for their positions.

## IV.   CONCLUSION

Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. Counts II and III of the Complaint are **DISMISSED WITHOUT PREJUDICE**, and Plaintiff is **GRANTED LEAVE** to amend the Complaint until Thursday, April 2, 2020.

**IT IS SO ORDERED.**

**Dated: Tuesday, March 3, 2020**

**S/J. Phil Gilbert**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
