IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TONYA M. BEASLEY, <br> Plaintiff, <br><br> v. <br><br> GRANITE CITY and <br> CRAIG KNIGHT, <br> Defendants. | Case No. 19–CV–01109–JPG |

## MEMORANDUM OPINION AND ORDER

This is a First Amendment retaliation case. Before the Court is Defendants Granite City and Craig Knight's Motion for Summary Judgment. (ECF No. 36). Plaintiff Tonya M. Beasley responded, (ECF No. 42-1); and the defendants replied, (ECF No. 45). For the reasons below, the Court **GRANTS** the defendants' Motion and **DIRECTS** the Clerk of Court to enter judgment.

### I. PROCEDURAL & FACTUAL HISTORY

The facts below are undisputed.

Beasley has worked as a police dispatcher (also called a *911 operator*) for the Granite City Police Department since 1998. (Beasley Dep. 11, ECF No. 37-1). For the past 15 to 17 years, she has also worked part-time as "a trainer for the Madison County 911 office," where she trains new 911 operators. (*Id.* at 12).

Beasley is a member of the Local 3405, a union that represents police dispatchers and other "clerical-oriented positions throughout the City." (*Id.* at 36). She served as the union's president from May 2013 to February 2017, and she is a shop steward today. (*Id.* at 34). Although she is no longer the president, Beasley still assists the current president during contract negotiations with the City, given her experience "participat[ing] in contract negotiations since 2002." (*Id.* at 36–37).

During her term as president of Local 3405, Beasley noticed that her supervisors at the Granite City Police Department were increasingly delegating tasks to 911 operators that were traditionally done by police officers. (*Id.* at 39–40). This includes checking on inmates every 30 minutes, feeding inmates, and administering medications. (*Id.* at 40–44). Beasley recalls having "a heated disagreement" with the police chief about the issue in May 2017, a few months after stepping down as union president:

> It was just telling him that Dispatch is becoming a dumping grounds for duties throughout the City and adding this is one more task that takes away from our priorities of officer safety and public safety, especially when there are times of storms and you have multiple class, calls out for the street department. Now we are asked to handle those calls on top of emergency calls for service.

(*Id.* at 44, 48).

On June 19, Beasley attended a contract negotiation between Local 3405 and the City, typically represented by "the mayor, comptroller, city attorney, and alderman." (*Id.* at 39, 46). During that meeting, Beasley "presented proposals to City representative[s] requesting additional pay and training for dispatchers being required to perform police officer duties." (*Id.* at 36). The mayor was surprised to learn that 911 operators were performing police-officer duties and requested a list of all the tasks that had been delegated. (*Id.* at 51). Beasley expressed concern to the mayor that complying with his request may anger her supervisors and forewarned of possible retaliation. (*Id.* at 50–51).

Around this time, the "Granite City Police Department began implementing a new procedure related to how the dispatchers were to apply for and be granted comp time requests and the need for specificity as to as to why comp time was incurred." (Knight Aff. 1, ECF No. 37-2). In the past, "if you don't get a lunch break, you get comp time." (Beasley Dep. at 62). For example, "You could specify 'No lunch because it was too busy,' you 'didn't have relief,' things along those

lines." (*Id.*). The new policy, however, "required all dispatchers to take a lunch break if such a break was feasible. Only if, under the circumstances, a dispatcher was unable to take their lunch break during a shift would the dispatcher then apply for and receive comp time for the missed lunch break." (Knight Aff. at 1–2). This change arose because some dispatchers "were abusing not taking a lunch" and "would selectively not take a lunch to earn comp time on shifts that they were working." (Beasley Dep. at 56).

On July 6, Beasley had to skip lunch "due to call volume and officers busy on calls." (*Id.* at 59). She then submitted a comp-time request that stated, "Reason for comp time: Too busy. No lunch. Too busy." (*Id.* at 60). Her request was denied at first: "Captain Knight demanded that [she] fill out a new form and said that [she] now had to add more details to explain the reason for her comp time request." (*Id.* at 61). She did, and the request was approved on July 10. (*Id.*). Beasley believed that the initial denial was in retaliation for her union work. (*Id.* at 80).

On July 12, "[t]he list of additional duties of dispatchers"—created by all the dispatchers—was provided to the mayor by the union president during the second contract negotiation. (*Id.* at 66). After the meeting, Captain Knight sent a memo to all the dispatchers and "removed some of those duties that had been a source of complaint for the contract negotiations." (*Id.* at 67).

The last contract negotiation was on August 3, during which Beasley "[a]dvised the Mayor that dispatchers were still having contact with prisoners, were still requested to move witnesses, subjects, and prisoners, and still preparing jail cards." (*Id.* at 77). Captain Knight sent Beasley a text message that day stating, "See me after the negotiation meeting." (*Id.* at 80). She did (along with the union president and a union representative), and they "discuss[ed] the duties that [dispatchers] are doing and the modifications to those duties that [Captain Knight] had sent" in the memo. (*Id.* at 82, 85). Beasley also brought up the separate issue of comp-time requests: According

to her interpretation of the union contract, comp-time requests could be approved by her immediate supervisor, Lieutenant DeYong—they did not have to go up the chain of command to Captain Knight. (*Id.* at 85). The next day, Captain Knight "sent an e-mail . . . stating that all comp time requests must be sent directly to his office for approval." (*Id.*). Beasley interpreted this as retaliation "[b]ecause now [Captain Knight] ultimately has the final decision without any influence of a supervisor working with [her] that day." (*Id.* at 87).

Beasley submitted another comp-time request on August 8 that was again initially denied. (*Id.* at 90). She spoke with Captain Knight three days later, who explained that her request "was denied because [she] was asked if [she] wanted to take a lunch" but "said, 'No.' " (*Id.* at 91). Beasley "told him that there have been many times that [she had] not taken a lunch and never put in for it," that she "was not abusing it," and that the dispatchers "were just plain busy." (*Id.* at 93). Lieutenant DeYong informed Beasley later that day that Captain Knight changed course and approved her comp-time request. (*Id.*).

That same day, on August 11, Beasley reported to Lieutenant DeYong that "she had been spit on by the adult prisoner being held in the cell that identified as the juvenile cell." (Rozell Aff. 1, ECF No. 37-4; Novacich Aff. 1, ECF No. 37-3). Lieutenant DeYong ordered her "to fill out an infectious disease report[1] about the spitting incident and to place the completed form in the proper box to be filed." (Novacich Aff. at 1). Beasley refused because she did not think it applied to her:

---

[1] Section 3.102(III)(L)(2) of the Granite City Police Policy requires employees to "document and report all incidents of possible contamination, transmissions by direct exposure of . . . bodily fluid transmission." (Rozell Aff. at 10).

> I marked "No" for all of the questions that were on there as far as [I] had any blood contact or received any medical treatment, gloves or gowns, nothing hit my skin. I didn't have any open wounds. It hit my pants. It was 30 minutes before I got off shift. I am going home and throwing them in the washer and be done with it.

(Beasley Dep. at 110). Lieutenant DeYong, who "intended to file criminal charges against the prisoner," watched a surveillance video "of the alleged spitting incident" and "determined that it was not possible for the prisoner to spit on [Beasley] and that [she] had not been spit upon." (Novacich Aff. at 2). An internal investigation was then conducted by Lieutenant Novacich at Chief Miller's behest.[2] (*Id.* at 5).

On August 22, Lieutenant Novacich "escorted [Beasley] to the Detective Division and turned on the interview room recording device while she stood by and watched." (*Id.*). "Beasley immediately became defensive and . . . visibly upset." (*Id.* at 5–6). "[She] then asked why the incident was being investigated so formally," and Novacich "explained to her that the incident . . . could result in her termination depending on [the investigation's] results." (*Id.* at 6). When confronted with the video evidence, "Beasley had no rebuttal and held to her claim that she was in fact hit in the legs with some form of liquid. . . . Beasley also stated numerous times that she felt as though this was in retaliation for something." (*Id.* at 7–8).

Following the investigation, Chief Miller placed Beasley on paid leave from "August 25 and into September." (Beasley Dep. at 117). Even after Beasley "drafted a letter about the prisoner spitting incident" as requested, Chief Miller "refused to lift her suspension." (*Id.* at 116). Then, on September 12, Chief Miller spoke to Beasley's supervisor at Madison County 911 office and informed her that Beasley "had been fired," "would be losing [her] certifications and would be

---

[2] Section 3.300(IV)(E)(14) of the Granite City Police Policy prohibits employees from "knowingly, either orally or in writing, mak[ing] false report . . . ." (Rozell Aff. at 19).

unqualified to work for Madison County." (*Id.* at 118). Ultimately, however, Beasley was not terminated but received a ten-day suspension following arbitration. (*Id.* at 120).

In 2019, Beasley filed suit here against the City of Granite City and Captain Knight, alleging that she "was suspended and subjected to a hostile working environment based upon the exercise of her First Amendment rights because of her union affiliation." (Compl. 10–12, ECF No. 1).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Rules of Civil Procedure thus "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 322. So "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Even still, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III.   LAW & ANALYSIS

Beasley alleges that the defendants violated her First Amendment associational rights by retaliating against her because of her union activity. She contends that the defendants repeatedly denied her comp-time requests after she met with the Mayor to negotiate on behalf of Local 3405. She also asserts that her suspension based on the spitting incident was pretextual and that the actual motivation was to stifle her work as a union representative.

The First Amendment to the United States Constitution secures America's tradition of free expression and association. "Free speech serves many ends. It is essential to our democratic form of government, and it furthers the search for truth. Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) (internal citations omitted). The right to associate "is cut from the same cloth." *McDonald v. Smith*, 472 U.S. 479, 482 (1985); *see Griffin v. Thomas*, 929 F.2d 1210, 1214 (7th Cir. 1991) (holding that freedom-of-association claims are assessed under the same analysis as freedom-of-speech claims).

With that in mind, "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate . . . ." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990). When an employee alleges that she was retaliated against in violation of the First Amendment, she must prove that (1) her speech was constitutionally protected; (2) she suffered a deprivation likely to deter speech; and (3) her speech was at least a motivating factor in the employer's action. *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013).

"[A]t summary judgment, the burden of proof is split between the parties. Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor . . . of the employer's decision to take retaliatory action against him. Then, the burden shifts to the employer to rebut the causal interference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then the employer's retaliatory actions are considered a 'necessary condition' of the plaintiff's harm, and the plaintiff has established the but-for causation needed to succeed on his claim." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (internal citations omitted). But if the employer "produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

"[S]uspicious timing will 'rarely be sufficient in and of itself to create a triable issue.' " *Kidwell*, 679 F.3d at 965 (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). "The reason is obvious: '[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment.' " *Id.* (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). "Accordingly, for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression . . . .' " *Id.* (quoting *Lalvani v. Cook Cty*, 269 F.3d 785, 790 (7th Cir. 2001)). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Id.* at 966. And "where a 'significant intervening event separate[es]' an employee's protected activity from the adverse

employment action he receives, a suspicious-timing argument will not prevail." *Id.* at 967 (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)).

According to Beasley, "we have a highly regarded employee who is negotiated [sic] a union contract on behalf of dispatchers, the substance of which revolved around dispatchers doing too many police officer duties, and suddenly she is being denied comp-time and being investigated for an incidence relating to a prisoner behaving badly. A jury could certainly conclude that the time of these incidence [sic] were not related to Plaintiff's sudden turn from good employee to bad employee, but rather due to her union activities." (Beasley's Resp. at 4). The Court disagrees.

First, the comp-time denials, standing alone, were not deprivations likely to deter speech. True enough, "even modest deprivations or threats can be sufficient . . . ." *Swetlik*, 738 F.3d at 825 n.2. But although the comp-time requests (July 6 and August 8) came within a few days of the contract negotiations (June 19, July 12, and August 3), they were granted soon after. This supposed deprivation is unlikely to chill any First Amendment activity, even if they occurred close in time to the negotiations. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise."); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (noting that harassment based on political beliefs could violate the First Amendment "unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs"); *Massey v. Johnson*, 457 F.3d 711, 721 (7th Cir. 2006) (alleged harassment too trivial to survive summary judgment).

Beasley's suspicious-timing argument is also too tenuous to state a prima facie case for First Amendment retaliation. The last contract negotiation was on August 3, and she was not suspended until September—this is not "so close on the heels of a protected act that an inference of causation is sensible." *Benuzzi v. Bd. of Educ. of Chi*, 647 F.3d 652, 665 (7th Cir. 2011). At any rate, the spitting incident was a "significant intervening event" separating Beasley's union activity from her suspension. Uncontroverted evidence shows that Granite City Police Policy (1) requires employees to submit an infectious disease report upon a possible exposure to a prisoner's bodily fluids and (2) prohibits employees from making a false report. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 349 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize [her] from being subsequently disciplined or terminated for inappropriate workplace behavior."). Whether or not the decision to suspend Beasley was correct, the spitting incident involved a full investigation and several individuals that are not parties here. *See Davis*, 651 F.3d at 675 ("The mere fact Davis's complaints closely preceded his termination is not enough to make this case analogous to others in which no investigation occurred, or where the challenged supervisor . . . was not the only party involved."). In other words, the long period between the contract negotiations and Beasley's suspension, coupled with the intervening spitting incident, precludes the inference of causation to be drawn solely based on suspicious timing.

Finally, even if Beasley could show that her union activity was at least a motivating factor for the comp-time denials and her suspension, she advances no evidence to rebut the defendants' contention that there were legitimate, nondiscriminatory reasons for their actions. Beasley herself testified that the change in comp-time policy came about because of abuses by her coworkers. Moreover, both of her requests seemingly flouted the new policy: The first contained a minimal description of the events requiring her to miss lunch, and the second was denied because Beasley

was supposedly allowed to take a lunch break but refused. Similarly, Beasley's assertion that the investigation "was in retaliation against her" rests on mere speculation: Her brief is not supported by any citations to the record, only conclusory assertions that there is "circumstantial evidence of retaliation." (Beasley's Resp. at 3). As discussed, however, the investigation into the spitting incident was rooted in the Granite City Police Policy, based on video evidence, and ended with a ruling from a neutral arbiter. Aside from Beasley feeling "as though this was in retaliation for something," she failed to establish that the proffered reason for her suspension was pretextual and that the real reason was retaliatory animus. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 590 (7th Cir. 2020) ("Pretext is not shown when an employer is wrong about its employee's performance, or is too hard on its employee, but when the employer's proffered reason is a lie.") (internal citations and quotation marks omitted). In other words, the defendants discharged their burden by showing a lack of evidence to support Beasley's case; and a fair-minded jury could not return a verdict for Beasley supported by only speculation or conjecture.

For all these reasons, the defendants are entitled to judgment as a matter of law.

## IV.   CONCLUSION

The Court **GRANTS** Defendants Granite City and Craig Knight's Motion for Summary Judgment and **DIRECTS** the Clerk of Court to enter judgment.

**IT IS SO ORDERED.**

**Dated: Thursday, December 17, 2020**

S/J. Phil Gilbert
**J. PHIL GILBERT
UNITED STATES DISTRICT JUDGE**
